M. SMITH, Circuit Judge,
concurring in part and dissenting in part:
While I join in the majority’s conclusion on standing as outlined in Part A of the Analysis section, I respectfully, but strongly, dissent from the other parts of the majority opinion. The truth is that the Department of the Interior’s (Interior) re-categorization of the late June 2004 releases from the Nimbus and New Melones reservoirs was a purely post-hoc rationalization by Interior, when it realized that it would run out of section 3406(b)(2) water to use for the year. Such a post-hoc rationalization flies in the face of what the Central Valley Project Improvement Act (CVPIA or Act), Pub.L. No. 102-575, 106 Stat. 4600 (1992), mandates, as well as the requirements of controlling case law. Moreover, affirming the district court’s “predominantly contributes to a primary purpose” standard, as the majority does, will inevitably lead to an evisceration of the politically delicate, negotiated limits on certain water uses clearly envisioned by the Congress when it enacted the CVPIA. I would reverse and remand to the district court.
“A man from the West will fight over three things: water, women and gold, usually in that order.” This quote from the late Senator Barry Goldwater illustrates a conflict that has been present in California since its early days. In California, water is life, and its absence is death, at least economically. Central Valley Project (CVP) water in particular is a precious resource for many competing interests. No one denies that protecting the fish, wildlife, and environment of the Central Valley, including Chinook salmon, Delta smelt, and other anadromous fish, is extremely important, and Congress has so found. But those are not the only interests at stake, which is what set up the Congressional fight that led to the limits included in the CVPIA. On the other side of the political divide stands another interest of enormous importance — protecting the livelihood of the farmers and workers who have harvested crops in the Central Valley for decades, and the legions of communities that depend on them.
The state of California produces more than half of the fruits, nuts, and vegetables grown in the United States, including many crops that are exclusively grown in California.[1] The San Joaquin Valley, known as “America’s fruit basket,” is home to a 20 billion dollar crop industry and produces more in farm sales than any oth *716 er individual state in the country.[2] Nine of the ten top agricultural production counties in the United States are in California.[3] Six of those counties, including Fresno, Tulare, Kern, Merced, Stanislaus, and San Joaquin counties, depend on CVP water for their crops.[4]
The de facto motto of this agriculturedependant region of the nation is “No water, no work.” The economic devastation to the Central Valley that has resulted from the type of water conflict represented by this lawsuit is pervasive. One need only take a drive down Highway 99, or Interstate 5, from Sacramento down to Bakersfield to witness the profound effect that a lack of water has had on this region. Approximately 250,000 acres of once-productive farmland lies fallow and unproductive.[5] The unemployment rates in the affected communities range from 20 percent up to 40 percent. Id. Mendota, one hard hit town, had a 38% unemployment rate in 2009, and nearly all of those who lost their jobs were farm workers.[6]
The reality is that water used to satisfy one interest necessarily takes water away from other interests. Thus, as has always been true in California, allocation of water requires a delicate balance, with potentially devastating implications. For that reason, the Congressional negotiations that ultimately led to the passage of the CVPIA were lengthy, bitter, and highly charged. However, when the negotiations concluded, the parties had reached a compromise regarding the allocation of certain water supplies. In my view, the guts of that hard won political compromise are about to be rendered meaningless by well-intentioned colleagues, who neither represent an affected constituency, nor have the technical expertise nor institutional capacity, to weigh the almost-certain impact of their ruling on those whose lives and fortunes will be devastated by them. For that reason, I believe we should faithfully adhere to the specifics of the political compromise contained in the Act, and not undermine that compromise through legal sophistry.
A. The History of the CVPIA
The CVPIA was passed as part of the Reclamation Projects Authorization and Adjustment Act of 1992. Pub L. 102-575, 106 Stat. 4600. On June 20, 1991, the House passed the original bill that would become the Act, H.R. 429. 137 Cong. Rec. D797-01. This early version of the Act did not contain any title pertaining to wildlife, fish, and habitat rehabilitation in the Central Valley, including the 800,000 acre foot (AF) limitation. See generally 137 Cong. Rec. H4799-01.
On April 10, 1992, the Senate, after its subcommittee meetings in October of 1991, passed an amended bill, which included among other provisions “Title XXXIV— CENTRAL VALLEY PROJECT FISH AND WILDLIFE ACT.” 138 Cong. Rec. S5564-02. While this new addition set forth many of the same goals as the eventual CVPIA does — namely, to “protect, restore, and enhance fish and wildlife habitat *717 in the Central Valley of California” — then-section 3406 still did not contain the explicit 800,000 AF requirement. Id. at S55965601. Rather, this section called for the establishment of a Central Valley Project Fish and Wildlife Advisory Committee and Task Force to carry out the purposes of the title. Id. at S5599-5600.
On June 18, 1992, the House considered and passed a separate bill, H.R. 5099, entitled the Central Valley Project Improvement Act. 138 Cong. Rec. H4918-06. This bill originally aimed to designate 1.5 million AF of water to be taken off the top of CVP water for the purposes of fish and wildlife enhancement and mitigation. Id. at H4921. However, the version of the bill that was being considered at this time did not specify an amount of water that must be allocated for such purposes. Id. at H4921. Instead, this bill stated that the Secretary of the Interior will:
Develop and implement a program for the acquisition of a water supply adequate to meet the purposes and requirements of this section. Such a program should identify how the Secretary will secure this water supply, utilizing the following options in order of priority: improvements in or modifications of the operations of the project; conservation; transfers; conjunctive use; purchase of water; purchase and idling of agricultural land; reductions in deliveries to Central Valley Project contractors.
Id. at H4926.
The bill was then incorporated into H.R. 429 on June 30, 1992. Title XXXIV of the bill became titled the Central Valley Reform Act and Section 3406 was titled “Fish, Wildlife and Habitat Reformation.” 138 Cong. Rec. H5589-02, H5615. Section 3406(b)(1) dealt with fish doubling and section 3406(b)(2) specified that the Secretary of the Interior will:
upon enactment of this Act, and after implementing the operational changes authorized in subsection (b)(1)(B), make available project water for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this section, except that such water shall be in addition to that required to implement subsections (b)(6) and (b)(15)(A). This water may be assigned immediately to supplement instream flows. The United States Fish and Wildlife Service shall conduct studies and monitoring activities as may be necessary to determine the effectiveness of such flows in meeting the goal established in subsection (b)(1). At the end of the initial five year period, the Secretary shall adjust the quantity of water assigned as necessary to meet the goal;
Id. at H5617-18 (emphasis added).
At that point, the House and Senate did not agree on the proposed amendments. Though the 800,000 AF figure was not part of either bill, the joint House-Senate conference compromise finally introduced the 800,000 AF provision. 138 Cong. Rec. H11493-01. The newly compromised bill mirrored the relevant language of the current Act:
upon enactment of this title dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations *718 under the federal Endangered Species Act.
138 Cong. Rec. H11572-01, H11605 (emphasis added). The hearings revealed that this figure had been negotiated down from the 1 million plus AF down to 800,000 AF. 138 Cong. Rec. S17289-01, S17303.
The legislative history noted was proceeded by years of discussion, and illustrates that the terms of the final Act passed in Congress — including the 800,000 AF limitation on water to be used for “fish, wildlife, and habitat restoration purposes” in section (b)(2) — were the carefully negotiated results of a long political process. To give effect to Congressional intent, and the plain meaning of the Act, we must tread very carefully, so as not to allow the 800,000 AF limitation to become meaningless. Unfortunately, the majority opinion will, in my view, lead to that very result.
B. The District Court Standard
Section 3406(b)(2) of the CVPIA states that the Secretary of the Interior shall:
upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act.
On its face, section (b)(2) allows 800,000 AF of CVP water to be used “for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title.” Next, section (b)(2) allows the Interior to “assist” the State of California in its protection efforts of the Delta Estuary. Finally, section (b)(2) allows the Interior to “help” to meet any other obligations under Federal or State law, such as the Endangered Species Act.
In the first ruling by the district court in this litigation, on October 19, 2001, the court held that “Interior had ‘discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements’ but had no discretion ‘whether or not to count CVP yield used for such (b)(2) purposes’ (i.e., all such uses must be counted).” San Luis & DeltaMendota Water Auth. v. Interior, 236 F.R.D. 491, 494 (E.D.Cal.2006). The court explained:
Section 3406(b)(2) unambiguously directs Interior to “dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title.” Interior has no discretion whether to annually provide more or less than 800 TAF of CVP yield [] for (b)(2) purposes, unless it makes certain findings under CVPIA § 3406(b)(2)(C).... Interior is also directed to annually dedicate and manage the mandatory 800 TAF of CVP yield “to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary [i.e., the WQCP]; and to help to meet such obligations as may be legally imposed upon the [CVP] under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act.” As a matter of law, this language *719 is not ambiguous — water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF (b)(2) mandate if so used.
The CVPIA is not silent on what amount of water used for these so-called “secondary” purposes is to be credited against the 800 TAF (b)(2) mandate. (E.g., could all 800 TAF of (b)(2) water be used to meet post-CVPIA-enactment ESA requirements?). Congress mandates that exactly 800 TAF of CVP yield [] be dedicated for (b)(2) purposes, whether “primary” or “secondary.” To hold otherwise would render the 800 TAF figure superfluous. This leaves to Interior, the discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements. However, if it were left to Interior’s “discretion” whether or not to count CVP yield used for such (b)(2) purposes, the annual 800 TAF cap would be illusory. The 800,000 TAF is intended by Congress as an immutable floor and ceiling on annual reallocation of water from CVP yield for (b)(2) purposes. If Interior uses more than 800 TAF for (b)(2) purposes in any year, but does not count all CVP yield used for such purposes, it violates CVPIA § 3406(b)(2).
Id. (internal citations omitted) (emphasis added). Thus, the district court ruled that Interior has discretion on how to allocate water within section (b)(2) purposes. For example, it could decide to use 500,000 AF for primary purposes, 200,000 AF to assist the State of California (via WQCP), and 100,000 AF for ESA. However, Interior does not have discretion to not charge, for example, the water used for WQCP as section (b)(2) water.
On appeal, we issued a non-precedential decision on June 3, 2003 and an amended decision on January 23, 2004, Bay Inst. of San Francisco v. United States, 66 Fed. Appx. 734, 735 (9th Cir.2003); Bay Inst. of San Francisco v. United States, 87 Fed. Appx. 637 (9th Cir.2004), reversing the district court on this holding:
The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield. To hold otherwise would defeat the primary purpose for which the 800,000 acre feet were designated-fish, wildlife, and habitat restoration. Section 3406(b)(2) provides that the “primary purpose” to which the 800,-000 acre feet should be dedicated is the implementation of “fish, wildlife, and habitat restoration purposes authorized by this title.... ” Section 3406(b)(2) also provides that the 800,000 acre feet may be used to “help” meet obligations under the Endangered Species Act and to “assist” in meeting water quality standards. If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act’s restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with the Interior’s mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).
Bay Inst., 87 Fed.Appx. at 637 (emphasis added). In my view, our previous merit panel attempted to deal with a situation such as the following: Assume, for example, a scenario where 1 million AF was needed for the water quality/outflow requirements under WQCP every year. Thus, if Interior had to charge this water against section (b)(2) water — regardless of whether that water furthers a primary *720 purpose or not — then Interior would have none of the 800,000 AF allocation left for the “primary purposes,” thus relegating the “primary purposes” related to anadromous fish to “no role at all.” Under our non-precedential ruling, if a water allocation is made pursuant to the WQCP and serves the purpose of achieving a salinity level for agricultural purposes, but marginally, and as a side effect also helps salmon who might find the new salinity level more favorable, the water does not necessarily count as section (b)(2) water. We placed the focus on whether water used is “for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized” by section (b)(2), and rejected the concept that water used for other non-section (b)(2) purposes — such as for WQCP or ESA purposes — categorically must count as section (b)(2) water.
Our prior cases do not detract from the fact that the politically negotiated 800,000 AF number was meant to be a hard limit. In other words, Interior cannot go above it and it is not within the Interior’s discretion to do so. However, the focus of the inquiry on when water allocated serves a primary purpose leaves open the question of how to determine if an allocation of water is “for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title.”
In answering this question, the district court applied the following test:
In practice, many actions taken to fulfill the fishery beneficial uses and objectives of the WQCP and/or actions taken to comply with the ESA may serve the primary purpose of the CVPIA. In keeping with the general structure of the CVPIA’s language, if the “primary” purpose of any action taken under the WQCP and/or the ESA is to support or effectuate a “primary purpose” program, such action must be counted toward the (b)(2) account. Environmental Plaintiffs advance a helpful definition of the term “primary,” the ordinary meaning of which is “predominant,” of “first importance,” or “principal.” See Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). Applying this definition, if an action taken under the WQCP and/or the ESA predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.
San Luis & Delta-Mendota Water Auth. v. Interior, 637 F.Supp.2d 777, 802 (E.D.Cal.2008) (emphasis added). The part of this test that I find troubling is that water allocation must count as section (b)(2) water only if it “predominantly contributes to one of the primary purpose programs.” Otherwise, Interior could choose to count it, or not count it, at its whim. No test we approve should permit the 800,000 AF negotiated, hard limit to be rendered meaningless, but I fear that the district court’s “predominantly contributes” test, which the majority blesses in its opinion, will eventually yield exactly such a result.
First, the district court’s test seems to confuse the use of the word “primary” in the CVPIA. As we previously have recognized, section 3406(b)(2) presents a hierarchy of purposes. Bay Inst., 87 Fed.Appx. at 637.
Section 3406(b)(2) provides that the “primary purpose” to which the 800,000 acre feet should be dedicated is the implementation of “fish, wildlife, and habitat restoration purposes authorized by this title----” Section 3406(b)(2) also pro *721 vides that the 800,000 acre feet may be used to “help” meet obligations under the Endangered Species Act and to “assist” in meeting water quality standards.
Id. Thus, “primary” as used in the statute most logically applies to the hierarchy of purposes. In other words, the primary purpose — of first and of first importance— is that the water should be used for fish, wildlife, and habitat restoration. Next, the water may be used to meet other obligations and water quality standards. The district court erroneously confuses this hierarchy of purposes with when an action is “for a primary purpose.” Stating that the word “primary” also has an ordinary meaning of “predominant,” the district court opines that an action therefore only serves a “primary purpose” if it “predominantly” serves it. Bay Inst., 87 Fed.Appx. at 637. However, there is nothing in the Act that indicates that its single use of the word “primary” means that water allocation has to “primarily” be for a “primary” purpose in order for it to count under section (b)(2). Thus, I do not find that the district court’s test is mandated by, or consistent with, the plain language of the Act.
Second, the district court test that a water allocation must “predominantly contribute” to a primary purpose will likely work to eviscerate the 800,000 AF limit. Consider the following hypothetical: (1) Interior allocates 500,000 AF of water to achieve a beneficial salinity under WQCP, that furthers agricultural purposes and helps both anadromous and non-anadromous fish that live in the river where the release is made; (2) Interior allocates 500,-000 AF of water under the ESA to help a variety of animals, including both anadromous and non-anadromous fish. There is clearly an overlap of purposes with each release, and these releases go toward both primary and non-primary section (b)(2) purposes. However, under the “predominantly contributes” test, Interior would be able to charge 0 AF of this water as section (b)(2) water, even though a primary purpose is served by the releases, because the water release contributes to several other non-section (b)(2) purposes as well and thus, does not “predominantly” serve a primary purpose. This would leave the Interior with its entire 800,000 AF section (b)(2) water allocation — on top of this 1 million AF already spent — to further aid the primary purposes. While the water allocation at issue in this case is 9000 AF, under the majority’s standard, Interior could easily explain away a much larger allocation of water.
This scenario may lead some on one side of the issue to ask, “so what?” This is simply more water to help more anadromous fish, which can only better the environmental outlook of the Central Valley. However, such a perspective obscures the fact that water used in this way will necessarily subtract from water that is allocated to the various cities and residents of those cities that depend on the same water for their livelihood and existence. In this sense, the size of the pie in a given year is fixed. A bigger slice for one person means a smaller slice for another. Most importantly (as already noted), adopting the standard set by the district court, and blessed by the majority, will inevitably eviscerate the meaning of the 800,000 AF number, and change it from a hard limit to a wish list.
Certainly, Interior has some discretion on how to charge section (b)(2) water. I do not accept the Water Agencies’ position that CVP water dedicated and managed to comply with an action required by the WQCP that also serves the fish, wildlife, and habitat restoration purposes in any way must be credited toward the 800,000 AF section (b)(2) limit. This rule draws *722 too sharp a line, and like we found in Bay Institute, would be too limiting on the hierarchy of purposes in section (b)(2). Under the Act, Interior could consider how much benefit there is to section (b)(2) primary purposes compared to other benefits. For example, if a water release coincided with a high population of salmon in the river, along with a few other species of non-anadromous fish, and the salinity level was crucial to ensure the survival of the salmon, then such water must count. However, if the water release were to occur at the end of the salmon run, and the salinity adjustment was not crucial to survival of the few salmon still there, but would still have a marginally beneficial effect, Interior should have discretion to not count this release as section (b)(2) water. I would not go so far as to say that a water allocation must “predominantly contribute” to a primary purpose. This standard sets too high a bar, and leaves too much discretion in the hands of Interi- or in how to charge the other water that does not meet this high bar. In my view, it is sufficient if a water release serves or effectuates the primary purpose in a consequential and non-incidental manner.
C. The Late June 2004 Releases
Irrespective of the erroneous standard that the district court set and that the majority affirms, the majority additionally ignores the overwhelming evidence that shows that what Interior did in accounting for the June 2004 Nimbus release (to meet Delta outflow objectives) and New Mel-ones release (to meet Vernalis flow objectives) was nothing short of post-hoc rationalization that we must find to be an abuse of discretion.
Interior itself released two telling documents on what its policies and practices were in how to charge water released pursuant to the 1995 WQCP. First, in a December 2003 Guidance Memo, Interior stated:
[Ajctions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control Board Decision D-1641 ... involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection. Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP. Most of the 1995 WQCP ... help fulfill the fish, wildlife, and habitat restoration purposes and measures authorizes by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objections of the 1995 WQCP serves Section 3406(b) (2)’s “primary purpose” of fish, wildlife, and habitat restoration.
Furthermore, in a November 22, 2004 joint letter from the Regional Director and the Manager of California-Nevada Office of the Fish and Wildlife Service stated that:
There exists some confusion concerning whether 1995 WQCP actions must be credited against Interior’s (b)(2) obligation. Some interested groups have observed that Interior has the discretion to count, or not to count, CVP water used for water quality control actions against the 800,000 acre-feet. The 1995 WQCP prescribes numerous actions that were developed in 1994 by Interior, working in consultation with the state, to help restore Delta fisheries, including anadromous fish. In fact, these fishery actions were included in the 1995 WQCP at the request of the Interior and other signatories to the Bay-Delta Accord. Counting CVP water used for the 1995 WQCP fishery actions, which further *723 the CVPIA’s primary restoration purposes, towards Interior’s (b)(2) obligation is consistent with the priority of uses prescribed by the Act.
In addition to these Interior documents, the WQCP itself sheds light on why some of its objectives were instituted in the first place. “The objectives for the protection of fish and wildlife beneficial uses are established for the following parameters: dissolved oxygen, salinity (expressed as electrical conductivity), Delta outflow, river flows, export limits, and Delta Cross Channel gate operation.” WQCP at 14. The Delta outflow objectives have been included “for the protection of estuarine habitat for anadromous fishes and other estuarine-dependent species.” Id. at 15. The purpose of the Vernalis flow requirement is “to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon.” Id.
These two documents, along with the 1995 WQCP objectives, unequivocally show the reasoning behind why Interior in April 2004 charged water designed to implement the VAMP, to meet Delta outflow objectives, and to meet Vernalis flow objectives to the section (b)(2) account. They show the reasoning behind why Interior also charged water to meet the WQCP requirement as to the location of X2 as section (b)(2) water. Similarly, in May 2004, they explain why Interior charged to the section (b)(2) account water that was used for upstream releases, VAMP implementation, and releases from the New Melones Reservoir. The charge of these water allocations are wholly consistent to the Interior’s own documents and the WQCP objectives.
However, subsequent to these releases, the daily accounting showed that by June 1, 2004, with still four months remaining in the 2004 section (b)(2) accounting year, Interior had used up all but 25,000 AF of its section (b)(2) water. It was not until Interior realized that it was running out of section (b)(2) water allocation that it changed its mind about how to charge similarly allocated water in the late June 2004 releases. The Nimbus release, which aimed to maintain Delta outflow objectives, was not charged to the section (b)(2) account even though water that was released to meet this objective in April 2004 was so charged. Likewise, the New Melones release, which aimed to maintain the Vernal-is flow release, was not charged to the section (b)(2) account even though water that was released to meet this objective in April and May of 2004 was so charged.
This situation does not present a case where Interior carefully considered and exercised its discretion in a meaningful way to categorize water releases that it truly believed did not further a primary purpose under section 3406(b)(2). Such is the discretion that is afforded to Interior under section (b)(2) and in Bay Institute. Rather, this situation is one where Interior realized too late that it was using too much water that it believed had to be charged as section (b)(2) water, and back-peddled in order to make its year end numbers match. Congress could not have intended to give Interior the discretion to erode the 800,000 AF number in this manner, nor does the plain meaning of the Act permit such a construction.
The majority appears to find solace in the post-hoc declarations that Interior submitted only after the litigation had started, arguing that the 2003 Guidance Memo and the 2004 Joint Letter do not necessarily foreclose the possibility that some water may not be charged under section (b)(2). In particular, the majority points to the use of the phrase “much of the (b)(2) water” in the 2003 Guidance Memo and what it calls ambiguous wording in the 2004 Joint Letter. Even if this were true, it *724 does not detract from Interior’s own general principle that “much of’ water used pursuant to the WQCP serves section (b)(2)’s primary purposes. If Interior wanted to show that late June 2004 releases fall into a narrow exception, it must, at a minimum, provide a basis for why the water does not further a primary purpose. In attempting to show this, Interior can only turn to its post-hoc declarations.
“The Supreme Court has forbidden district courts from relying upon litigation affidavits and ‘post hoc’ rationalizations for agency action.” Presidio Golf Club v. Nat’l Park Serv., 155 F.3d 1153, 1164-65 (9th Cir.1998) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Though an exception is carved out for situations where formal findings could be prepared to explain an agency’s actions, the declarations submitted by Interior do not meet this exception. See id. What was submitted were declarations that attempted to explain why the water allocation categorization may have been appropriate in hindsight. The declarations do not show that — at the crucial time that Interior made those releases back in June of 2004 — Interior had carefully considered whether the releases would serve a primary purpose or not, and properly counted the water on that basis. I cannot agree with the majority’s conclusion that Interi- or’s actions in accounting for the late June 2004 releases was not an abuse of discretion.
I respectfully dissent from all but the standing analysis of the majority opinion.

. California Department of Food and Agriculture, California Agricultural Resources Directory 2010-11 at 17, http://www.cdfa.ca.gov/ Statistics/PDFs/ResourceDirectory_20102011.pdf.

. Katie Paul, Dying on the Vine, Newsweek, Aug. 23, 2009, at 1, available at http://www. newsweek.com/2009/08/23/dying-on-the-vine. html.

. California Agricultural Resources Directory at 18-19.

. See Bureau of Reclamation, Map of Central Valley Project, http://www.usbr.gOv/projects// ImageServer?imgName=Doc_ 1238104613478 .pdf.

. Valerie Richardson, It's the Farmers vs. Fish for California Water, The Washington Times, Aug. 20, 2009, available at http://www. washingtontimes.com/news/2009/aug/20/itsfarmers-vs-fish-for-california-water/.

. Dying on the Vine at 1.